FILED by _____ YH _____ D.C.

**Dec 8, 2020**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **20-80092-CR-RUIZ/REINHART**

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 1957(a)
18 U.S.C. § 2
18 U.S.C. § 982(a)(1), (a)(7)

UNITED STATES OF AMERICA

v.

MICHAEL LIGOTTI,

Defendant.

_____ /

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### Drug and Alcohol Rehabilitation

1.      Substance abuse treatment regulations described a continuum of care for patients experiencing substance abuse including, from most intensive to least intensive, detox, residential treatment, partial hospitalization ("PHP"), intensive outpatient ("IOP"), and outpatient ("OP"). The varying levels of treatment provided were based on the severity of a patient's addiction and the patient's current symptoms. Persons undergoing treatment on an outpatient basis, whether in PHP, IOP, or OP, often elected to live in a "recovery residence," also known as a "sober home," "halfway house," or, in some cases, "community housing," with other persons who were also in

1

treatment and committed to a drug- and alcohol-free lifestyle. While these terms for the residences are commonly interchanged, they are referred to herein as "sober homes."

2.      Detox facilities assisted patients in dealing with the effects of withdrawal from the complete cessation of using drugs and/or alcohol. After successfully completing detox or other inpatient services, patients received treatment for their underlying addiction in the form of outpatient care, through either PHPs, IOPs, and/or OPs. PHP, IOP, and OP patients attended facilities on an ongoing basis where treatment was rendered, generally in the form of group and individual therapy sessions. The distinction among the three different treatment plans related to, among other things, the amount of therapy time on a daily or weekly basis.

3.      Medical and osteopathic doctors, both physicians, played an essential role in substance abuse treatment. Without a physician, patients at the substance abuse treatment centers would not have received prescriptions for drugs, received treatment, or had urine, blood, or other bodily fluid testing. Bodily fluid tests, which were prescribed by the physicians, were billed to health plans by the substance abuse treatment centers and/or laboratories, as were patient evaluations performed by a physician. Physicians would authorize blood tests and urine drug tests through orders or prescriptions often certifying such services were medically necessary. Without a physician's order authorizing such bodily fluid testing, private insurance companies would often not pay for such services. Sometimes, physicians would issue standing orders that authorized a testing protocol ("Standing Orders") for multiple patients over a period of time, which was a practice that could result in widespread fraud and abuse since such bodily fluid testing was supposed to be tailored to a specific patient's needs, and individualized to each patient's substance abuse treatment.

2

4.      The Florida Department of Children and Families ("DCF") licensed and oversaw addiction treatment facilities that provided detox, residential treatment, PHP, IOP, and OP programs in Florida. Florida state regulations governed substance abuse treatment services, including standards for detox, residential treatment, PHP, IOP and OP. Fla. Admin. Code §§ 65D-30.006, 65D-30.0081, 65D-30.0091 and 65D-30.010. One of the requirements that DCF placed on certain facilities was that they have a medical director.

5.      In Florida, substance abuse treatment services were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fla. Stat. § 397.301. Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law. Fla. Stat. § 397.431.

6.      All "clinical treatment" under the Marchman Act was required to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fla. Stat. § 397.311(26)(a).

7.      The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA"), also promulgated guidelines for varying levels of treatment based on the severity of the addiction, including detox and IOP.

8.      The American Society of Addiction Medicine ("ASAM") was a professional medical society representing over 6,000 physicians, clinicians, and associated professionals in the field of addiction medicine. ASAM published the ASAM Criteria, which was a collection of objective guidelines that gave clinicians a way to standardize treatment planning and where

patients were placed in treatment, as well as how to provide continuing, integrated care and ongoing service planning, including for detox, PHP, IOP, and OP treatment services.

9.     The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

10.    The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

11.    Medical practitioners, such as physicians and nurse practitioners, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number, also known as a "DEA number," to each qualifying medical practitioner, including physicians and nurse practitioners.

12.    Chapter 21 of the Code of Federal Regulations, Section 1306.04, governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning

4

and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id.*

13.     Regulations also provided that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a).

14.     One form of treatment for substance abuse involved the use of a prescription controlled substance, buprenorphine, which was an opioid. Buprenorphine was sometimes used in substance abuse treatment to wean opioid-addicted patients off of other opioids, including heroin and narcotic painkillers. Because drugs containing buprenorphine were Schedule III controlled substances, meaning that there was a strong potential for abuse, resulting in fatal and non-fatal overdoses, prescribing physicians were also required to have two DEA registrations. The first registration was the standard "DEA number" referenced above that was required to prescribe any controlled substance. The second registration was a "DEA X-number," which was granted to a limited number of physicians with valid "DEA numbers" who had completed a training program on substance abuse treatment and fulfilled other regulatory requirements.

15.     The Drug Addiction Treatment Act ("DATA") of 2000 amended the CSA to permit physicians to treat opioid addiction using Schedules III-V, U.S. Food and Drug Administration ("FDA")-approved narcotic drug products without having to obtain a separate DEA registration as a narcotic treatment program. This was known as a "DATA-waiver." Those registered with the DEA as DATA-waived physicians could initially treat 30 patients, and later apply for and receive authorization to treat up to 100 patients, at any one time. In 2016, Congress passed the

Comprehensive Addiction and Recovery Act ("CARA"), which amended the CSA to permit nurse practitioners and physician assistants registered with the DEA to also treat opioid addiction based on state authority. In 2016, the Department of Health and Human Services published a Federal Register Notice which increased the patient limitation to 275 for DATA-waived physicians.

### Bodily Fluid Testing in Substance Abuse Treatment

16.     One monitoring strategy used by substance abuse treatment centers and medical professionals to detect recent drug or alcohol use by a patient was bodily fluid testing consisting of urine drug testing (and blood testing). There were two primary categories of urine drug testing: immunoassay testing (e.g., a drug screen or point of care ("POC") testing) and specific drug identification testing (e.g., definitive, or confirmatory, testing).

17.     POC urine testing involved collecting urine in a specific cup designed for testing. The specimen was analyzed using a color band or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific types of drugs. POC tests typically cost between $5 and $10 and could be read easily by a layperson. This testing was convenient and less costly, and the results could be read quickly. POC testing was the most common form of urine testing performed at treatment facilities.

18.     Definitive (or confirmatory) urine drug tests used gas liquid chromatography-mass spectrometry ("LCMS") and/or gas chromatography, or high-performance liquid chromatography, to analyze the urine specimen. These techniques were highly sensitive and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. This testing was more precise, more sensitive, and detected more substances than other types of urine testing. Results of definitive testing took longer, and the tests were

significantly more expensive than POC testing; single urine specimens that underwent drug screen analyzers and LCMS testing could be billed to insurance companies for thousands of dollars.

**Payment for Substance Abuse Treatment**

19.     Insurance coverage for substance abuse treatment and urine and blood testing was available through a number of avenues, including, but not limited to, the following private insurance companies: Blue Cross/Blue Shield or Florida Blue ("BCBS"); Humana, Inc. ("Humana"); Aetna Health Management LLC and Aetna Life Insurance for Members ("Aetna"); United Behavioral Health and United Health Group, Inc. ("United"); and Cigna Healthcare ("Cigna") (these private insurers are collectively referred to hereinafter as the "Insurance Plans"). The Insurance Plans offered health care coverage directly to consumers and through employers. They also managed health care plans offered to federal employees. The Insurance Plans covered medical and clinical treatment costs of rehabilitation in accordance with the terms of their policies and state and federal law, including requirements that addiction treatment services and testing be medically necessary.

20.     Under the terms of insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services that: (a) were medically necessary and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

21.     The Insurance Plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b).

22.     Typically, health care providers, including substance abuse treatment facilities and medical professionals, submitted claims for substance abuse treatment and bodily fluid testing to the Insurance Plans electronically, via interstate wires.

### The Defendant and Relevant Entities

### The Treatment Centers

23.     Whole Health, LLC ("Whole Health") was a medical practice, located at 402 SE 6th Avenue, Delray Beach, Florida, in Palm Beach County. Whole Heath was purportedly an urgent care facility, a family practice, and an addiction treatment medical office; however, the majority of Whole Health's patients were individuals covered by private insurance who were addicted to substances such as drugs and alcohol. Whole Health purportedly provided such patients, including Insurance Plans' beneficiaries, with substance abuse treatment services. Whole Health had the ability to do bodily fluid testing in an in-house laboratory, including blood testing and urine drug testing. According to corporate records filed with the State of Florida, Whole Health opened in July 2005. **MICHAEL LIGOTTI** was Managing Member and Registered Agent of Whole Health, effectively organizing and incorporating Whole Health as a medical clinic.

24.     Real Life Recovery Delray, LLC ("RLR") was located at 258 S.E. 6th Avenue, Suite 7, Delray Beach, Florida, in Palm Beach County. RLR purported to operate as a licensed "substance abuse service provider" or "substance abuse treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. According to corporate records filed with the State of Florida, RLR was incorporated on or about May 16, 2011. At that time, Eric Snyder was listed as one of three Managing Members of RLR. Snyder became the sole Managing Member of RLR on August 27, 2013.

8

25.     A Safe Place, LLC ("ASP") was a multi-bed residence located at 1100 SW 4th Avenue, Apartment 21B, Delray Beach, Florida, in Palm Beach County, purporting to operate as a "recovery residence," also referred to as a "sober home." According to corporate records filed with the State of Florida, ASP was incorporated on December 3, 2010, with Eric Snyder as the Registered Agent, and one of two Managing Members. Eric Snyder became the sole Managing Member of ASP on March 20, 2014. Bank records indicate that ASP began doing business as Halfway There, Florida, LLC ("HWT"). According to corporate records filed with the State of Florida, HWT was incorporated as a separate entity on September 4, 2013, and Eric Snyder became the sole owner of HWT on October 2, 2013. HWT was a multi-bed residence in Palm Beach County, Florida, that was also located at 1100 SW 4th Avenue, Delray Beach, Florida, purporting to operate as a "recovery residence," also referred to as a "sober home." The "recovery residence" operated at 1100 SW 4th Avenue, Delray Beach, Florida by Eric Snyder is referred to hereinafter as "HWT/ASP."

26.     HWT/ASP and RLR (collectively "HWT/RLR") were separate legal entities, but functioned as the same business. HWT/ASP was the "sober home" portion of the business, while RLR served as the "substance abuse treatment center" or substance abuse treatment portion of the business. RLR billed health care benefits programs for substance abuse treatment services it purportedly rendered to HWT/ASP "sober home" residents, also referred to as "clients." Most HWT/RLR clients were between the ages of 18 and 26 years old, and were dependent on their parents' health insurance, which covered addiction treatment services. HWT/RLR submitted claims for reimbursement for substance abuse treatment services to various health care benefit programs, including the Insurance Plans. **MICHAEL LIGOTTI** was the Medical Director at HWT/RLR from in or around April 2012, to in or around July 2013.

27.     Substance Abuse Treatment Center 1 was located in Palm Beach County, Florida. It purportedly offered substance abuse treatment services for persons suffering from alcohol and drug addiction, and billed various health care benefits programs, including the Insurance Plans, for services it purportedly rendered to patients. **MICHAEL LIGOTTI** was the Medical Director for Substance Abuse Treatment Center 1 from in or around January 2017, to in or around July 2018.

28.     Substance Abuse Treatment Center 2 was located in Palm Beach County, Florida. It purportedly offered substance abuse treatment services for persons suffering from alcohol and drug addiction, and billed various health care benefits programs, including the Insurance Plans, for services it purportedly rendered to patients. **MICHAEL LIGOTTI** was the Medical Director for Substance Abuse Treatment Center 2 beginning in or around June 2016.

29.     Substance Abuse Treatment Center 3 was located in Palm Beach County, Florida. It purportedly offered substance abuse treatment services for persons suffering from alcohol and drug addiction, and billed various health care benefits programs, including the Insurance Plans, for services it purportedly rendered to patients. **MICHAEL LIGOTTI** was the Medical Director for Substance Abuse Treatment Center 3 beginning in or around June 2016.

30.     Substance Abuse Treatment Center 4 was located in Palm Beach County, Florida. It purportedly offered substance abuse treatment services for persons suffering from alcohol and drug addiction, and billed various health care benefits programs, including the Insurance Plans, for services it purportedly rendered to patients. **MICHAEL LIGOTTI** was the Medical Director for Substance Abuse Treatment Center 4 beginning in or around June 2016.

31.     HWT/RLR, Substance Abuse Treatment Centers 1-4, and other sober homes and substance abuse treatment centers, submitted claims to the Insurance Plans for reimbursement for

bodily fluid testing, including blood testing, and urine drug testing, that were authorized by **MICHAEL LIGOTTI**, through Standing Orders **LIGOTTI** signed.

### The Testing Laboratories

32.     Lab 1 was a Texas company located in Dallas County, Texas.

33.     Lab 2 was a Florida company located in Broward County, Florida.

34.     Lab 3 was a Florida company located in St. John's County, Florida.

35.     Lab 4 was a Florida company located in Broward Company, Florida.

36.     Lab 5 was a Florida company located in Broward County, Florida.

37.     Lab 6 was a Florida company located in Broward County, Florida.

38.     Lab 7 was a Florida company located in Orange County, Florida.

39.     Lab 8 was a Florida company located in Palm Beach County, Florida.

40.     Lab 9 was a Florida company located in Palm Beach County, Florida.

41.     Labs 1-9 submitted claims to the Insurance Plans for reimbursement for bodily fluid testing, including blood testing and urine drug testing, that were authorized by **MICHAEL LIGOTTI** through Standing Orders **LIGOTTI** signed.

### The Defendant and Other Individuals

42.     **MICHAEL LIGOTTI**, a resident of Palm Beach County, Florida, was the founder and owner of Whole Health. According to the Florida Department of Health, **LIGOTTI** was an Osteopathic Physician, License Number OS9035, which was issued on September 10, 2003. As of the date of this Indictment, the license was clear and active, and set to expire on March 31, 2022. **LIGOTTI** organized and incorporated Whole Health as a medical clinic. Whole Health advertised its practice as an urgent care facility, a family doctor, and an addiction treatment medical office. The majority of Whole Health's patients were insured individuals who were addicted to substances

such as drugs and alcohol. **LIGOTTI** was the only physician at Whole Health. **LIGOTTI** also purportedly served as Medical Director or authorizing physician for over fifty (50) substance abuse treatment centers, sober homes, and testing laboratories in the Southern District of Florida, including but not limited to HWT/RLR, and Substance Abuse Treatment Centers 1-4.

43.     Individual 1, a resident of Broward County, Florida, was an Advanced Registered Nurse Practitioner ("ARNP") who worked for Whole Health under the supervision of **MICHAEL LIGOTTI** and referred **LIGOTTI** to be the Medical Director or authorizing physician for various substance abuse treatment centers, sober homes, and testing laboratories.

44.     Individual 2, who was a resident of Broward County, Florida, worked as a broker for Labs 2-5.

45.     Individual 3, who was a resident of Palm Beach County, Florida, owned and operated Substance Abuse Treatment Centers 2-4. Individual 3 also worked as a broker for Lab 6.

46.     Individual 4, who was a resident of Palm Beach County, worked as a broker for Lab 7.

47.     Individuals 5-7, each of whom were residents of Palm Beach County, owned and operated Substance Abuse Treatment Center 1.

48.     Individual 8, a resident of Palm Beach County, Florida, was the office manager for Whole Health.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around May 2011, and continuing through in or around September 2020, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**MICHAEL LIGOTTI,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.      to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication

13

in interstate and foreign commerce, certain writings, signs, and signals in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

3.    It was a purpose of the conspiracy for the defendant and his co-conspirators to unjustly enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to the Insurance Plans; (b) concealing the submission of false and fraudulent claims to the Insurance Plans, and the receipt and transfer of fraud proceeds; and (c) diverting the fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.    **MICHAEL LIGOTTI** treated patients at Whole Health, a medical clinic he owned, which was purportedly in the business of, among other things, providing substance abuse treatment services to individuals suffering from drug and alcohol addiction.

5.    To obtain patients for Whole Health, **MICHAEL LIGOTTI** agreed to become Medical Director or authorizing physician for more than 50 substance abuse treatment centers, sober homes, and testing laboratories located in the Southern District of Florida, including but not limited to HWT/RLR and Substance Abuse Treatment Centers 1-4. Sometimes **LIGOTTI** charged a nominal fee, but often he was not paid a salary by these addiction treatment facilities. **LIGOTTI** would then sign Standing Orders authorizing bodily fluid testing, including blood and urine drug testing, for these addiction treatment facilities.

6.      Once these substance abuse treatment centers, sober homes, and testing laboratories obtained these Standing Orders from **MICHAEL LIGOTTI**, they ordered and caused the ordering on a systematic basis of excessive and medically unnecessary blood tests and urine drug tests, including definitive or confirmatory urine drug testing. These substance abuse treatment centers, sober homes, and testing laboratories submitted claims to the Insurance Plans for reimbursement for such urine drug tests and other bodily fluid testing that were medically unnecessary.

7.      In return for **MICHAEL LIGOTTI** signing the Standing Orders and serving as Medical Director or authorizing physician, the substance abuse treatment centers, sober homes, and testing laboratories were required to send their patients to Whole Health for purported substance abuse treatment, and to allow Whole Health's staff or **MICHAEL LIGOTTI**'s medical extenders (i.e., ARNPs, Nurse Practitioners, and Physician's Assistants), including but not limited to Individual 1, to see their patients at their substance abuse treatment centers, sober homes, and testing laboratories. Whole Health also ordered, under **LIGOTTI**'s authorization as the ordering physician, excessive and medically unnecessary blood tests and urine drug tests, including definitive or confirmatory urine drug testing, for these patients.

8.      Individual 1 would often refer **MICHAEL LIGOTTI** to substance abuse treatment centers, sober homes, and testing laboratories as a Medical Director or authorizing physician willing to sign Standing Orders. Individual 1 did this in exchange for payments from **LIGOTTI**. Individual 1 and other medical extenders purportedly supervised by **LIGOTTI** would often see patients at these facilities, and bill for services, on behalf of Whole Health.

9.      **MICHAEL LIGOTTI** signed Standing Orders for HWT/RLR, which was owned and operated by Eric Snyder, in return for the opportunity to bill the Insurance Plans for addiction treatment services purportedly provided to patients from HWT/RLR by Whole Health.

**LIGOTTI**'s Standing Orders authorized bodily fluid testing services billed to the Insurance Plans by HWT/RLR. HWT/RLR patients were simultaneously treated at Whole Health and their Insurance Plans were billed for additional addiction treatment and other services, including bodily fluid testing services.

10.     **MICHAEL LIGOTTI** signed Standing Orders for Substance Abuse Treatment Center 1, which was owned and operated by Individuals 5-7, in return for the opportunity to bill the Insurance Plans for addiction treatment services purportedly provided by Whole Health to patients from Substance Abuse Treatment Center 1. **LIGOTTI**'s Standing Orders authorized bodily fluid testing services billed to the Insurance Plans by Substance Abuse Treatment Center 1. Substance Abuse Treatment Center 1's patients were simultaneously treated at Whole Health and their Insurance Plans billed for additional addiction treatment and other services, including bodily fluid testing services.

11.     **MICHAEL LIGOTTI** signed Standing Orders for Substance Abuse Treatment Centers 2-4, which were owned and operated by Individual 3, in return for the opportunity to bill the Insurance Plans for addiction treatment services purportedly provided by Whole Health to patients from Substance Abuse Treatment Centers 2-4. **LIGOTTI**'s Standing Orders authorized bodily fluid testing services billed to the Insurance Plans by Substance Abuse Treatment Centers 2-4. Substance Abuse Treatment Center 2-4's patients were simultaneously treated at Whole Health and their Insurance Plans were billed for additional addiction treatment and other services, including bodily fluid testing services.

12.     Individual 2 worked as a broker for Labs 2-5 and connected **MICHAEL LIGOTTI** to these Labs as a source of Standing Orders to authorize bodily fluid testing including blood and urine drug testing for these testing laboratories as the authorizing physician. **LIGOTTI** also

16

recommended that Individual 2 use Lab 1 for Substance Abuse Treatment Centers 3-5, which Individual 2 owned and operated. **LIGOTTI**'s Standing Orders authorized bodily fluid testing services billed to the Insurance Plans by Labs 1-5. Lab 1-5's patients were simultaneously treated at Whole Health and their Insurance Plans were billed for additional addiction treatment and other services, including bodily fluid testing services.

13.     Individual 3 worked as a broker for Lab 6 and connected **MICHAEL LIGOTTI** to Lab 6 as a source of Standing Orders to authorize bodily fluid testing including blood and urine drug testing for this testing laboratory as the authorizing physician. **LIGOTTI**'s Standing Orders authorized bodily fluid testing services billed to the Insurance Plans by Lab 6. Lab 6's patients were simultaneously treated at Whole Health and their Insurance Plans were billed for additional addiction treatment and other services, including bodily fluid testing services.

14.     Individual 4 worked as a broker for Lab 7 and connected **MICHAEL LIGOTTI** to Lab 7 as a source of Standing Orders to authorize bodily fluid testing including blood and urine drug testing for this testing laboratory as the authorizing physician. **LIGOTTI**'s Standing Orders authorized bodily fluid testing services billed to the Insurance Plans by Lab 7. Lab 7's patients were simultaneously treated at Whole Health and their Insurance Plans were billed for additional addiction treatment and other services, including bodily fluid testing services.

15.     **MICHAEL LIGOTTI** signed approximately 137 Standing Orders as the authorizing physician for substance abuse treatment centers, sober homes, and testing laboratories located in the Southern District of Florida, including but not limited to HWT/RLR, Substance Abuse Treatment Centers 1-4, and Labs 1-9. **LIGOTTI** did so often (but not always) as Medical Director for these facilities, or at least as the authorizing physician. **LIGOTTI**'s Standing Orders

authorized bodily fluid testing services billed to the Insurance Plans by these additional substance abuse treatment centers, sober homes, and testing laboratories.

16.     By signing these Standing Orders, **MICHAEL LIGOTTI** authorized excessive and medically unnecessary blood and urine drug testing, including definitive or confirmatory urine drug testing, and other bodily fluid testing, by these substance abuse treatment centers, sober homes, and testing laboratories. **LIGOTTI** often attested when he signed these Standing Orders that the blood and urine drug testing he was authorizing was medically necessary.

17.     Individual 8 helped facilitate **MICHAEL LIGOTTI**'s relationships with these substance abuse treatment centers, sober homes, and testing laboratories at Whole Health as office manager, and was often their point of contact, including but not limited to HWT/RLR, Substance Abuse Treatment Facilities 1-4, and Labs 1-9. Individual 8 also actively sought to recruit other substance abuse treatment centers, sober homes, and testing laboratories to Whole Health by having **LIGOTTI** serve as their Medical Director or authorizing physician.

18.     Individual 8 often ordered Whole Health clinical staff to conduct urinalysis testing on urine samples that were not appropriate for such testing, and at times Individual 8 signed laboratory requisition, other laboratory testing forms, and prescriptions, as well as other various forms, on **MICHAEL LIGOTTI**'s behalf. Individual 8 also ordered Whole Health medical staff to improperly sign off on urine testing forms instead of **LIGOTTI**.

19.     **MICHAEL LIGOTTI** and his co-conspirators ordered and caused the ordering on a systematic basis of excessive, medically unnecessary blood tests and urine drug tests, including definitive or confirmatory urine drug testing, for Whole Health patients, often double-billing such services at Whole Health that were already billed for these same patients by the substance abuse treatment centers, sober homes, and testing laboratories.

20. **MICHAEL LIGOTTI** and his co-conspirators also billed or caused to be billed various other services, including but not limited to office visits and psychiatric therapy sessions that never occurred and which Whole Health did not have the proper staff to conduct.

21. **MICHAEL LIGOTTI** and his co-conspirators submitted claims to the Insurance Plans through Whole Health for bodily fluid testing, including urine drug tests, and addiction treatment services that were not medically necessary, were not provided as billed, never occurred, or were provided, if at all, by unlicensed professionals that accordingly did not qualify as actual addiction treatment.

22. **MICHAEL LIGOTTI** and his co-conspirators ordered and caused the ordering of blood tests, urine drug screens, and expensive definitive or confirmatory urine drug testing by Whole Health and various substance abuse treatment centers, sober homes, and testing laboratories as described above, that were not medically necessary or reimbursable by the Insurance Plans, in that, among other things: (i) the blood and urine drug tests were ordered on a systematic basis and not on an individualized basis according to the medical need of the patient; (ii) the urine drug tests were often ordered too frequently (i.e., multiple times per week) to allow for meaningful use of the tests in medical decision-making, as additional tests were often ordered before any medical professional or doctor received or reviewed the results of the previous tests; (iii) the blood and urine drug tests were not timely reviewed by a qualified medical professional or by a doctor or treatment professional in developing or modifying the patients' treatment; (iv) many of the urine drug tests were not reviewed by a qualified medical professional or by a doctor or treatment professional until days or weeks after the results were reported, at which point the patient often had been discharged, and some urine drug tests were thus not reviewed at all; and (v) when a patient tested positive for a substance that he or she should not have been taking, Whole Health

and or the treatment facilities seldom took action or imposed consequences for patients with medical insurance.

23.     **MICHAEL LIGOTTI**, as Medical Director or the authorizing physician for various substance abuse treatment centers, sober homes, and testing laboratories as described above, or as the only physician at Whole Health, or otherwise, ordered various blood tests, drug screens, and expensive definitive or confirmatory urine drug testing for addiction treatment patients, regardless of whether such testing was medically necessary or conducted, and regardless of whether such tests were billed in compliance with the terms of the patients' Insurance Plans. **LIGOTTI** also often failed to timely review the results of these tests, and did not integrate the results of these blood and urine drug tests into the treatment plans for patients at Whole Health or the substance abuse treatment centers, sober homes, and testing laboratories. Further, **LIGOTTI** failed to meaningfully oversee the treatment of patients at Whole Health or the substance abuse treatment centers, sober homes, and testing laboratories, and ignored the fact that therapy sessions at Whole Health were provided by unlicensed professionals that did not qualify as actual addiction treatment. Further, **LIGOTTI** failed to conduct or timely review initial psychiatric evaluations, did not form individual treatment plans and meet with patients to discuss patient care, and ignored the fact that patients at Whole Health, and the substance abuse treatment centers, sober homes, and testing laboratories often used illicit drugs. Finally, **LIGOTTI** prescribed and dispensed controlled substances to patients at Whole Health, including but not limited to buprenorphine and benzodiazepines, outside the scope of professional practice, and not for a legitimate medical purpose.

24.     **MICHAEL LIGOTTI** and his co-conspirators submitted and caused the submission of false and fraudulent insurance claims to the Insurance Plans, via interstate wire

communication, for various health care benefits, primarily substance abuse treatment services and bodily fluid testing, including blood testing and urine drug testing, that were medically unnecessary, not provided, not provided by qualified personnel, and otherwise not eligible for reimbursement.

25.     From on or about May 1, 2011, to on or about March 31, 2020, **MICHAEL LIGOTTI** and his co-conspirators billed and caused to be billed through Whole Health more than approximately $235 million in claims submitted to the Insurance Plans, and received approximately $31 million in payment.

26.     In addition to billings submitted by Whole Health, between on or around January 1, 2013, until on or about September 30, 2020, **MICHAEL LIGOTTI** and his co-conspirators authorized the substance abuse treatment centers and sober homes at which **LIGOTTI** served as Medical Director or otherwise partnered with, to bill and cause to be billed to the Insurance Plans an additional approximately $60 million in claims, of which $16 million was paid.

27.     Furthermore, **MICHAEL LIGOTTI** and his co-conspirators authorized excessive laboratory testing for patients from these sober homes and addiction treatment facilities, which resulted in approximately $451 million in additional submitted claims from on or about January 1, 2013 to on or about March 3, 2020, and approximately $80 million in payments to laboratories.

28.     Adding these amounts together, the volume of claims that **MICHAEL LIGOTTI** and his co-conspirators submitted and caused to be submitted exceeds approximately $746 million billed and $127 million paid by the Insurance Plans.

29.     **MICHAEL LIGOTTI** and his co-conspirators used the proceeds from the false and fraudulent claims for their own use and the use of others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-10**
**Health Care Fraud**
**(18 U.S.C. § 1347)**

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around May 2011, and continuing through in or around September 2020, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs.

**Purpose of the Scheme and Artifice**

3.      It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to the Insurance Plans; (b) concealing the submission of false and fraudulent claims to the Insurance Plans, and the receipt and transfer of fraud proceeds; and (c) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

**The Scheme and Artifice**

4.      The allegations contained in the Manner and Means of the Conspiracy section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

**Acts in Execution or Attempted Execution of the Scheme and Artifice**

5.    On or about the dates set forth below, in Palm Beach County, in the Southern

District of Florida, and elsewhere, the defendant,

**MICHAEL LIGOTTI,**

in connection with the delivery of and payment for health care benefits, items, and services, did

knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice

to defraud a health care benefit program affecting commerce, as defined by Title 18, United States

Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and

fraudulent pretenses, representations, and promises, money and property owned by, and under the

custody and control of, said health care benefit programs, in that the defendant submitted and

caused the submission of false and fraudulent claims seeking the identified dollar amounts,

representing that the services listed below were medically unnecessary, not provided, not provided

by qualified personnel, and otherwise not eligible for reimbursement:

| Count | Patient | Approx. Claim Date | Approx. Claim Amount | Benefit Provider | Claim Number | Description of Claim & CPT Codes |
|-------|---------|--------------------|----------------------|------------------|--------------|----------------------------------|
| 2 | J.P. | 2/8/16 | $19,525 | Aetna | 160523E7582600 | 46 Pathology and Laboratory CPT codes, & 99205, G0479, H0048 |
| 3 | J.Y. | 8/26/16 | $5,000 | BCBS | N00001R859258291 | 5 Pathology and Laboratory CPT codes, & 99214, H0048, 90832, 90863 |
| 4 | J.D. | 11/3/16 | $3,225 | BCBS | H100000582713712 | 99204, 36415, G0479, H0048, 82570, 83986 |
| 5 | J.D. | 11/25/16 | $4,609 | BCBS | H100000570808566 | 5 Pathology and Laboratory CPT codes & G0479 |

| Count | Patient | Approx. Claim Date | Approx. Claim Amount | Benefit Provider | Claim Number | Description of Claim & CPT Codes |
|-------|---------|--------------------|--------------------|------------------|--------------|----------------------------------|
| 6 | T.M. | 4/17/17 | $6,400 | BCBS | M00001R949114593 | 8 Pathology and Laboratory CPT codes, 90832, 90863, 36415, 99214 |
| 7 | B.F. | 4/19/17 | $150 | BCBS | H100000601830896 | 90832 (Psychotherapy 30 min. session) |
| 8 | T.M | 5/25/17 | $150 | BCBS | H100000604864997 | 90832 (Psychotherapy 30 min. session) |
| 9 | J.Y. | 9/15/17 | $150 | BCBS | Q100000627034429 | 90832 (Psychotherapy 30 min. session) |
| 10 | T.M. | 3/5/19 | $15,360 | BCBS | H100000737155037 | 51 Pathology and Laboratory CPT Codes, & 99214 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 11-13
### Money Laundering
### (18 U.S.C. § 1957(a))

On or about the dates as to each count set forth below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### MICHAEL LIGOTTI,

did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000, and such property having been derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity, as set forth below:

24

| Count | Approx. Date of Transaction | Description of Monetary Transaction |
|-------|------------------------------|-------------------------------------|
| 11 | 1/3/2016 | **MICHAEL LIGOTTI** negotiated Whole Health Check No. 4343 in the amount of $97,600, using an account ending in 0135 at Bank of America, made payable to Jewels in Time. |
| 12 | 3/22/2018 | **MICHAEL LIGOTTI** negotiated Whole Health Check No. 4417 in the amount of $31,000, using an account ending in 0135 at Bank of America, made payable to Jewels in Time. |
| 13 | 11/13/2018 | **MICHAEL LIGOTTI** wired $19,000 from a Whole Health account ending in 0135 at Bank of America to a City National Bank account ending in 6402, in the name of **LIGOTTI**'s company, 3 Star, LLC. |

It is further alleged that the specified unlawful activity is wire fraud, in violation of Title 18, United States Code, Section 1343, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care and wire fraud, in violation of Title 18, United States Code, Section 1349.

In violation of Title 18, United States Code, Sections 1957(a) and 2.

## FORFEITURE
### (18 U.S.C. § 982(a)(1) and (a)(7))

1. The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **MICHAEL LIGOTTI**, has an interest.

2. Upon a conviction of a violation of Title 18, United States Code, Sections 1347, or 1349, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. Upon conviction of a violation of Title 18, United States Code, Section 1957(a), as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4.      The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, the following:

      a.      real property located at 717 Seagate Drive, Delray Beach, Florida 33483;

      b.      real property located at 3860 Lone Pine Road, Delray Beach, Florida 33445; and

      c.      real property located at 402 S.E. 6th Avenue, Delray Beach, Florida 33483;

5.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(1)) and (a)(7), Title 21, United

States Code, Section 853, and Title 28, United Stats Code, Section 2461(c).

A TRUE BILL

FOREPERSON

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

ALEXANDRA CHASE
ASSISTANT UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

DANIEL KAHN
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ALLAN MEDINA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JAMES V. HAYES
SENIOR LITIGATION COUNSEL
LIGIA MARKMAN
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

27

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

CASE NO._____

v.

MICHAEL LIGOTTI

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

_____Defendant._____/

**Court Division:** (Select One)

| | | | | New defendant(s) | Yes ____ | No ____ |
|---|---|---|---|---|---|---|
| ___ | Miami | ___ | Key West | Number of new defendants | | |
| ___ | FTL | _✓_ WPB | ___ FTP | Total number of counts | | |

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:   (Yes or No)   No____
   List language and/or dialect   _____

4. This case will take _30_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)

   | I | 0 to 5 days | _____ | Petty | _____ |
   |---|---|---|---|---|
   | II | 6 to 10 days | _____ | Minor | _____ |
   | III | 11 to 20 days | _____ | Misdem. | _____ |
   | IV | 21 to 60 days | ✓ | Felony | ✓ |
   | V | 61 days and over | _____ | | |

6. Has this case previously been filed in this District Court?   (Yes or No)   No____
   If yes: Judge_____   Case No._____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)   Yes____
   If yes: Magistrate Case No.   20-8265-BER
   Related miscellaneous numbers:   20-8266-BER, 20-8267-BER
   Defendant(s) in federal custody as of   _____
   Defendant(s) in state custody as of   _____
   Rule 20 from the District of   _____

   Is this a potential death penalty case? (Yes or No)   No____

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?   Yes ____   No _✓_

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   Yes ____   No _✓_

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   Yes ____   No _✓_

_____
ALEXANDRA CHASE
ASSISTANT UNITED STATES ATTORNEY
District Court No. A5501746

*Penalty Sheet(s) attached

REV 6/5/2020

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  MICHAEL LIGOTTI**

**Case No:**

Count #1:

Conspiracy to commit wire fraud and health care fraud

Title 18, United States Code, Sections 1349, 1343, and 1341

**\*Max. Penalty**: Twenty years' imprisonment; $250,000 fine or twice the value of gross gain or loss, whichever greater; three years' supervised release; criminal forfeiture

Counts #2-10:

Health care fraud

Title 18, United States Code, Section 1347

**\*Max. Penalty**: Ten years' imprisonment; $250,000 fine or twice the value of gross gain or loss, whichever greater; three years' supervised release; criminal forfeiture

Counts #11 -13:

Engaging in monetary transactions in property derived from specified unlawful activity

Title 18, United States Code, Section 1957

**\*Max. Penalty**: Ten years' imprisonment; $250,000 fine or twice the amount of the criminally derived property involved in the transaction; three years' supervised release; criminal forfeiture