UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CR-80092-RUIZ

UNITED STATES OF AMERICA

vs.

MICHAEL LIGOTTI,

Defendant.
_____/

# FACTUAL PROFFER

The United States Attorney's Office for the Southern District of Florida and the Department of Justice, Criminal Division, Fraud Section (collectively, the "Office") and the Defendant **MICHAEL LIGOTTI** stipulate to, and agree not to contest, the following facts, and stipulate that such facts, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure, provide a sufficient factual basis for the plea of guilty in this case.

If this case had gone to trial, the Government would have proven beyond a reasonable doubt the following: that the defendant, **MICHAEL LIGOTTI** conspired to commit health care fraud and wire fraud in violation of Title 18, United States Code, Section 1349, and that he committed health care fraud, in violation of Title 18, United States Code, Section 1347.

Defendant **MICHAEL LIGOTTI**, his counsel, and the United States agree that, had this case proceeded to trial, the Office would have proven the following facts beyond a reasonable doubt, and that the following facts are true and correct, and are sufficient to support a plea of guilty:

1. At all times relevant to this agreement, "substance abuse" was defined as "the abuse of alcohol or other drugs." 42 U.S.C. § 290cc-34(4). "Treatment" meant "the management and care of a patient suffering from alcohol or drug abuse, a condition which is identified as having been caused by that abuse, or both, in order to reduce or eliminate the adverse effects upon the patient." 42 C.F.R. § 2.11.

2. At all times relevant to this agreement, substance abuse treatment was regulated under state and federal law. Pursuant to Florida's Marchman Act, appropriate substance abuse treatment needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. 397.311(a).

3. The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") is tasked with establishing and implementing comprehensive programs to improve the provision of

treatment and related services to individuals with respect to substance abuse. 42 U.S.C. § 290aa. SAMHSA, in connection with the Drug Enforcement Administration ("DEA"), also regulates the use of prescription opioids, including buprenorphine, to treat opioid addiction. Due to the potential for abuse and misuse of these medications, SAMHSA and DEA have put in place a licensing regimen, wherein licensed physicians who were already registered with the DEA to prescribe controlled substances could receive specialized training and apply for authorization to prescribe buprenorphine to treat opioid addiction. After meeting SAMHSA's requirements, applicants would receive a second registration from the DEA, known as a DEA "X-number," allowing these physicians to lawfully prescribe buprenorphine to treat opioid addiction in accordance with DEA, SAMHSA, and state prescribing requirements.

4. The American Society of Addiction Medicine ("ASAM") is a professional medical society representing over 6,000 physicians, clinicians and associated professionals in the field of addiction medicine. ASAM published the ASAM Criteria, which was a collection of objective guidelines that give clinicians a way to standardize treatment planning and where patients are placed in treatment, as well as how to provide continuing, integrated care and ongoing service planning, including for Detox, PHP, IOP, and OP treatment services.

5. In Florida, only licensed physicians, and not physician's assistants, nurses, or advanced registered nurse practitioners ("ARNP"s), were allowed to prescribe controlled substances prior to January 1, 2017. Under Florida law, prior to July 1, 2020, ARNPs were required to practice under the supervision of a physician licensed to practice medicine in Florida, and were required to have a written protocol setting out the work the ARNP was authorized to do under the physician's supervision. ARNPs operating under these protocols could only prescribe medications under their own DEA certification. Both the supervising physician and the ARNP are responsible for the ARNP's work.

6. In addition to substance abuse treatment programs, ASAM and SAMHSA promulgated guidelines for "sober homes." Sober homes were living facilities where clients lived together in a drug-free and alcohol-free environment while working to maintain sobriety. Sober homes generally did not provide medical care or clinical services to their residents; such services were provided at a substance abuse treatment center, or by an outside physician. Clients at sober homes were expected to pay their own rent and utilities, allowing the sober homes to recover their costs. When properly managed, sober homes operated as alcohol and drug free residential environments for individuals attempting to abstain from alcohol and drugs.

7. Substance abuse treatment centers provided services, such as individual or group therapy sessions, to assist clients in overcoming their addictions. There were varying levels of treatment provided, including Partial Hospitalization Programs ("PHP"), Intensive Outpatient Programs ("IOP"), and Outpatient Programs ("OP). PHPs, IOPs, or OPs could be billed to health care benefit programs when they were medically necessary and provided by, or overseen by, licensed medical professionals.

8. The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance abuse treatment in several ways. First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26. Second, federal law mandated that substance abuse treatment and other mental health treatment

must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage. Federal health care benefits programs were likewise expanded.

9. These federal laws created access to coverage through a number of avenues, including federal health care benefits programs like the Federal Employees Health Benefits Program ("FEHBP"), health plans sponsored by private employers (including the National Railroad Passenger Corporation ("Amtrak") employee health care benefit plans), and health plans offered directly by private insurance companies. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

10. Both ERISA and non-ERISA health benefit plans, including Affordable Care Act plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield ("BCBS"), Aetna, Cigna, Humana, and Optum ("Insurance Plans"). All of these Insurance Plans paid claims submitted in this matter during the relevant charged conspiracy period.

11. All of these Insurance Plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual." All of the Insurance Plans therefore affected interstate commerce.

12. Regardless of the type of plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the individual's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

13. Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," made it a felony for any person, health care provider, or health care facility, including any licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

14. Florida law also stated that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

15. Under state and federal law, health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were actually rendered; (c) were provided by a properly licensed service provider, and (d) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

16. Bodily fluid testing could be used, among other things, to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urine drug testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

17. Like other medical tests, bodily fluid testing, including blood testing and urine drug testing, could be billed to insurance and reimbursed pursuant to the terms of the insurance policy. Insurance companies were only responsible for reimbursing claims for testing that were "medically necessary," actually performed, prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

18. At all times relevant to this agreement, **MICHAEL LIGOTTI**, a resident of Palm Beach County, Florida, was a primary care physician licensed to practice in the state of Florida, working in the Southern District of Florida.

19. At all times relevant to this agreement, Whole Health, LLC ("Whole Health") was a medical practice, located at 402 SE 6th Avenue, Delray Beach, Florida, in Palm Beach County. Whole Heath was purportedly an urgent care facility, a family practice, and an addiction treatment medical office; however, the majority of Whole Health's patients were individuals covered by private insurance who were addicted to drugs and alcohol. Whole Health purportedly provided such patients, including Insurance Plans' beneficiaries, with substance abuse treatment services. Whole Health had the ability to do bodily fluid testing in an in-house laboratory, including blood testing and urine drug testing. According to corporate records filed with the State of Florida, Whole Health opened in July 2005. **MICHAEL LIGOTTI** was the founder, owner, Managing Member, and Registered Agent of Whole Health, effectively organizing and incorporating Whole Health as a medical clinic. **LIGOTTI** was the only physician at Whole Health.

20. **LIGOTTI** also purportedly served as Medical Director or authorizing physician for over fifty (50) sober homes, substance abuse treatment centers, and clinical testing laboratories in the Southern District of Florida, including but not limited to those described below.

21. At all times relevant to this agreement, Real Life Recovery Delray, LLC ("RLR") RLR purported to operate as a licensed "substance abuse service provider" or "substance abuse treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. Halfway There, Florida, LLC ("HWT") was a multi-bed

residence purporting to operate as a "recovery residence," also referred to as a "sober home." HWT and RLR (collectively "HWT/RLR") were separate legal entities, but functioned as the same business. HWT was the "sober home" portion of the business, while RLR served as the "substance abuse treatment center" or substance abuse treatment portion of the business. RLR billed health care benefits programs for substance abuse treatment services it purportedly rendered to HWT "sober home" residents, also referred to as "clients." HWT/RLR had its principal places of business in Delray Beach, Florida. HWT/RLR submitted claims for reimbursement for substance abuse treatment services to various health care benefit programs, including the Insurance Plans. **MICHAEL LIGOTTI** was the Medical Director at HWT/RLR from in or around April 2012, to in or around July 2013.

22. At all times relevant to this agreement, Academy Health Solutions, LLC ("Academy") was a substance abuse treatment center that had its principal place of business in Lake Park, Florida. Academy offered substance abuse treatment services for persons suffering from alcohol and drug addiction, and billed various health care benefits programs, including the Insurance Plans, for services it rendered to patients. **MICHAEL LIGOTTI** was the Medical Director for Academy Health from in or around January 2017, to in or around July 2018.

23. Defendant **MICHAEL LIGOTTI** was at the center of a scheme involving: Whole Health; other individuals that he supervised; and the owners and operators of (a) sober homes, (b) substance abuse treatment centers, and (c) clinical testing laboratories, including but not limited to those listed above in paragraphs 21-22. The scheme worked as follows:

   a. **LIGOTTI** was introduced to sober home, substance abuse treatment center, and clinical laboratory testing owners and operators by Richard Sterne and others. **LIGOTTI** often agreed to provide medical services to residents of the facility (in the case of sober homes) or to serve as the facilities' medical director (in the case of treatment centers), and/or to authorize bodily fluid testing including urine drug testing to be done by clinical testing laboratories.

   b. **LIGOTTI** then signed standing orders authorizing expensive and medically unnecessary definitive urine drug tests for patients multiple times a week.

   c. The sober homes and treatment centers required their patients to undergo urine drug screens three or more times per week, as per **LIGOTTI's** orders. Regardless of the drug screen results, urine specimens were routinely sent to external clinical testing laboratories for definitive testing, and the facilities would routinely conduct new screens for clients before staff ever received or reviewed prior definitive test results.

   d. The clinical testing laboratories then billed health care benefit programs for these tests, and paid kickbacks to the sober home and substance abuse treatment center operators for each sample they tested.

   e. In exchange for **LIGOTTI's** authorization of standing orders for bodily fluid testing, including urine drug testing, the treatment centers agreed to pay **LIGOTTI** a minor monthly fee (which he would seldom actually collect), and either (a) required their patients to regularly visit **LIGOTTI's** practice at Whole Health for additional treatment and testing, and/or (b) allowed **LIGOTTI** to

send staff to the facility to conduct tests and treatments there, as described below. This allowed **LIGOTTI** to profit by billing patients' insurance for duplicative, unnecessary, and expensive tests and treatments.

24. HWT/RLR, Academy Health, other sober homes and substance abuse treatment centers, and various clinical testing laboratories, submitted or caused to be submitted claims to the Insurance Plans for reimbursement for urine drug testing, that were authorized by **MICHAEL LIGOTTI**, often through standing orders **LIGOTTI** signed. These claims for urine drug testing were often not medically necessary.

25. In return for **MICHAEL LIGOTTI** signing the standing orders and serving as Medical Director or authorizing physician, the substance abuse treatment centers, and sober homes, were required to send their patients to Whole Health for purported substance abuse treatment, and to allow Whole Health's staff or **MICHAEL LIGOTTI**'s medical extenders (i.e., ARNPs, Nurse Practitioners, and Physician's Assistants), including but not limited to Richard Sterne, to see their patients at their substance abuse treatment centers. Whole Health also ordered, under **LIGOTTI**'s authorization as the ordering physician, excessive and medically unnecessary blood tests and urine drug tests, including definitive or confirmatory urine drug testing, for these patients that were seen at Whole Health.

26. In this manner, over the course of the charged conspiracy, **MICHAEL LIGOTTI** signed approximately 137 standing orders for substance abuse treatment centers and other entities, including but not limited to HWT/RLR, and Academy Health. **LIGOTTI** did so as Medical Director for these facilities, or as simply the authorizing physician.

27. **MICHAEL LIGOTTI**'s standing orders authorized these entities to submit or cause to be submitted claims for, among other things, urine drug testing services to the Insurance Plans. By signing these standing orders, **LIGOTTI** authorized excessive and medically unnecessary urine drug testing, including definitive urine drug testing. **LIGOTTI** often attested when he signed these standing orders that the urine drug testing he was authorizing was medically necessary, when in fact it was not.

28. In addition, **MICHAEL LIGOTTI** and his co-conspirators ordered and caused the ordering on a systematic basis of excessive, medically unnecessary blood tests and urine drug tests, including definitive urine drug tests, for Whole Health patients, often double-billing the same services for patients at Whole Health that had already been billed by the substance abuse treatment centers, sober homes, and/or the clinical testing laboratories.

29. **MICHAEL LIGOTTI** and his co-conspirators also billed or caused to be billed various other services, including but not limited to psychiatric therapy sessions that never occurred, and which Whole Health did not have the proper staff to conduct.

30. **MICHAEL LIGOTTI** and his co-conspirators submitted and caused to be submitted claims to the Insurance Plans through Whole Health for bodily fluid testing, including urine drug tests, and addiction treatment services that were not medically necessary, were not provided as billed, never occurred, or were provided, if at all, by unlicensed professionals that accordingly did not qualify as actual addiction treatment.

31. **MICHAEL LIGOTTI** and his co-conspirators ordered and caused the ordering of bodily fluid testing (such as urine drug testing and blood testing), including blood testing at Whole Health, and expensive definitive urine drug testing by Whole Health and various substance abuse treatment centers, sober homes, and clinical testing laboratories as described above, that were not medically necessary or reimbursable by the Insurance Plans.  These tests were fraudulent because: (i) the blood and urine drug tests were ordered on a systematic basis and not on an individualized basis according to the medical need of the patient; (ii) the urine drug tests were often ordered too frequently (i.e., multiple times per week) to allow for meaningful use of the tests in medical decision-making, as additional tests were often ordered before any medical professional or doctor received or reviewed the results of the previous tests; (iii) the urine drug tests were not timely reviewed by a qualified medical professional or by a doctor or treatment professional in developing or modifying the patients' treatment; (iv) many of the urine drug tests were not reviewed by a qualified medical professional or by a doctor or treatment professional until days or weeks after the results were reported, at which point the patient often had been discharged, and some urine drug tests were thus not reviewed at all; and (v) when a patient tested positive for a substance that he or she should not have been taking, Whole Health and or the treatment facilities seldom took action or imposed consequences for patients with medical insurance.

32. Further, **MICHAEL LIGOTTI** failed to meaningfully oversee the treatment of patients at Whole Health or the substance abuse treatment centers, and sober homes, and ignored the fact that therapy sessions at Whole Health were provided by unlicensed professionals that did not qualify as actual addiction treatment. Further, **LIGOTTI** failed to conduct or timely review initial psychiatric evaluations, did not form individual treatment plans and meet with patients to discuss patient care, and ignored the fact that patients at Whole Health, and the substance abuse treatment centers, and sober homes, often used illicit drugs.

33. In this manner, **MICHAEL LIGOTTI** and his co-conspirators submitted and caused the submission of false and fraudulent insurance claims to the Insurance Plans, via interstate wire communication, for various health care benefits, primarily substance abuse treatment services and bodily fluid testing, including blood testing and urine drug testing, that were medically unnecessary, not provided, not provided by qualified personnel, and otherwise not eligible for reimbursement.

34. Finally, the government would have shown that all of these actions took place in the Southern District of Florida.

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

Date: 10/04/2022      By: /s/ James V. Hayes
                         JAMES V. HAYES
                         SENIOR LITIGATION COUNSEL
                         LIGIA M. MARKMAN
                         TRIAL ATTORNEY
                         ALEX CHASE
                         CHIEF

Date: Oct 4, 2022     By: /s/ Jose Quinon
                         JOSE QUINON, Esq.
                         ATTORNEY FOR DEFENDANT

Date: 10/4/22         By: /s/ Michael Ligotti
                         MICHAEL LIGOTTI
                         DEFENDANT